UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IMX, INC., d/b/a GLOBAL NETOPTEX,
INC.,

                    Plaintiff,

        vs.

E-LOAN, INC. and BANCO POPULAR
NORTH AMERICA, INC.,

                    Defendants.

CASE NO.  09-20965-CIV-JEM
Magistrate Judge Brown

---

**MEMORANDUM OF LAW IN SUPPORT OF IMX, INC.'S RENEWED MOTION FOR
SUMMARY JUDGMENT OF NOTICE OF INFRINGEMENT, PATENT OWNERSHIP
AND CONCEPTION OF THE ASSERTED CLAIMS**

---

DLA PIPER LLP (US)
M. Elizabeth Day (Bar No. 188125)*
Mark Belloli (Bar No. 244290)*
Erik R. Fuehrer (Bar No. 252578)*
2000 University Avenue
East Palo Alto, CA 94303
Telephone: (650) 833-2000
Fax: (650) 833-2001

Lead Counsel for Plaintiff IMX, Inc.


*Admitted Pro Vice*

ASTIGARRAGA DAVIS MULLINS
   & GROSSMAN, P.A.
Edward M. Mullins & Annette C. Escobar
Fla. Bar No.s 864930 & 369380
emullins@astidavis.com
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Tel: (305) 372-8282; Fax: (305) 372-8202

Local Counsel for Plaintiff IMX, Inc.

I.  **STATEMENT OF ISSUES TO BE DECIDED AND IDENTIFICATION OF EXHIBITS FOR THE COURT'S CONSIDERATION**

IMX, Inc. ("IMX") requests that the Court enter summary judgment on three narrow issues for which there is no genuine issue of material fact:  (1) IMX provided E-Loan actual notice of infringement under 35 U.S.C. §287(a) on November 24, 2003 (Exhibits A-C);  (2) IMX owns all right, title and interest in U.S. Patent No. 5,995,947 (the "'947 patent") (Exhibits D-T; in particular Exhibits D-J & T); and, (3) the inventors of the '947 patent conceived of the subject matter of each asserted claim no later than August 1995 (Exhibits T-X).

II.  **INTRODUCTION**

The Court should grant summary judgment in IMX's favor on the issue of notice of infringement (a damages issue) because it is undisputed that (1) the filing a complaint for infringement constitutes actual notice such that damages begin to accrue and (2) IMX filed an action for infringement of the '947 patent against E-Loan in the District of Delaware (the "Delaware Action") on November 24, 2003.  35 U.S.C. §287(a); Statement of Material Facts ("IMX's SOMF") ¶¶1-3.  IMX indisputably provided notice of infringement to E-Loan no later than November 24, 2003, and is entitled to damages for all subsequent acts of infringement.

The Court also should grant summary judgment in IMX's favor on the fact that IMX owns the '947 patent.  In May 1998, the inventors of the '947 patent assigned all of their rights in the patent to "IMX Mortgage Exchange," the name IMX used to transact business in California at the time.  IMX's SOMF ¶¶4-14.  Because construction of the assignment agreement is a legal issue, and because it cannot reasonably be disputed that the inventors intended to and did assign the '947 patent to IMX, summary judgment that IMX owns the patent is proper.

Finally, undisputed evidence confirms that the inventors of the '947 patent conceived of the subject matter of claims 1-2, 7-12, 19-21 and 26-31 (the claims at issue), no later than August

1995.  IMX's SOMF ¶¶15-25.  While they likely conceived of these inventions earlier, each invention was described in writing (*i.e.*, corroborated) no later than August 1995.  *Id.*

## III.   FACTUAL BACKGROUND

### A.   IMX And The '947 Patent

IMX was founded in the mid-1990's by a mortgage loan broker, Stephen Fraser, who believed there was a better way to communicate rate and product information during the loan application process.  Ex. T, Decl. of Dr. Sadashiv ("Adiga Decl."), ¶¶3, 14-15.  His vision became IMX, the first electronic and Internet accessible network used to process loan applications.  *Id.* ¶¶14-15.  Specifically, IMX's transaction-based system provided an online alternative to the traditional phone-and-fax based methods for applying for and locking mortgage loans.  *Id.* From this novel idea, IMX built an online service called the IMX Exchange.  IMX's revolutionary system was met with instant critical acclaim and commercial success.

Early in 1995, Mr. Fraser was introduced to Dr. Sadashiv Adiga and Suresh Payankannur (collectively, "the inventors").  Consistent with Mr. Fraser's vision, the inventors then set out to design and build the IMX Exchange. Ex. T, Adiga Decl. ¶8.  In the process, they also conceived of the subject matter of IMX's '947 patent.  By July 1995, they had conceived of their revolutionary system; by August 1995 they had fully reduced their ideas to writing.  *Id.* at ¶¶9-34; IMX's SOMF ¶¶15-25.

IMX filed a patent application with the United States Patent and Trademark Office ("USPTO") on September 12, 1997.  Ex. U, '947 patent.  On May 21, 1998, the inventors assigned their interest in the application to IMX Mortgage Exchange, the California fictitious business name under which IMX transacted business  Ex. D; Ex. T, Adiga Decl., ¶5; IMX's SOMF ¶¶4-14.  This assignment was recorded with the USPTO.  Ex. D at IMX-E003425-

2

003434.  On November 30, 1999, the USPTO awarded IMX the '947 patent, titled "Interactive Mortgage and Loan Information and Real-Time Trading System."  Ex. U, '947 patent.

**B.      The Prior Delaware Action And The Status Of This Proceeding**

On November 24, 2003, IMX filed an action for infringement of the '947 patent in the District of Delaware against E-Loan, InterActive Corp, LendingTree, and Priceline.com.  Ex. A; IMX's SOMF ¶1.  On February 14, 2004, E-Loan answered IMX's complaint in the Delaware Action and asserted affirmative defenses and declaratory judgment counterclaims of non-infringement.  Ex. B; IMX's SOMF ¶2.  Pursuant to a stipulation between IMX and E-Loan, E-Loan was dismissed *without prejudice* on June 14, 2004.  Ex. C; IMX's SOMF ¶3.

During the course of the Delaware Action, IMX settled with Priceline.com and proceeded to trial against LendingTree.  Following trial, the jury awarded IMX $5,794,400 for LendingTree's infringement on January 23, 2006.  On July 27, 2007, the Delaware court entered final judgment in favor of IMX for $12,541,319, which included enhanced damages due to LendingTree's willful and ongoing infringement.  IMX and LendingTree settled while the matter was on appeal.  Because E-Loan continued its infringement after the dismissal without prejudice in June 2004, IMX filed this action shortly after the conclusion of the Delaware Action.  D.E.#1.

**IV.     ARGUMENT**

**A.      Standard For Granting Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that a court may grant summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

3

**B.    IMX Provided Actual Notice Of Infringement To E-Loan On November 24, 2003, When It Filed The Delaware Action**

A patentee may recover damages from the time an accused infringer is given "actual notice" of alleged infringement. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001); 35 U.S.C. §287(a).  Actual notice requires "proof that the infringer was notified of the infringement and continued to infringe thereafter." 35 U.S.C. §287(a).  The Patent Act specifically provides that the "[f]iling of an action for infringement" constitutes actual notice. *Id.*

The issue of actual notice is "properly decided upon summary judgment when no reasonable jury could find that the patentee either has or has not provided actual notice." *Gart*, 254 F.3d at 1339.  Here, it is undisputed that IMX filed an action for infringement of the '947 patent against E-Loan on November 24, 2003, in the District of Delaware. Ex. A; IMX's SOMF ¶1.; 35 U.S.C. §287(a).  This fact alone ends the inquiry because no fact other than the communication of notice itself is material to the notice issue.[1]

Notwithstanding the filing of the Delaware Action and the unambiguous language of Section 287, E-Loan has taken two alternative positions alleging that IMX failed to provide notice of infringement on November 24, 2003.  First, E-Loan takes the unsupported position that the November 24, 2003, notice was somehow "extinguished" when the parties stipulated to the dismissal of the Delaware Action *without prejudice*.  E-Loan thus implicitly contends that IMX was required to provide notice of infringement to E-Loan *a second time* following the dismissal without prejudice of the Delaware Action. Ex. C; IMX's SOMF ¶3.  This purported "second notice" requirement is found nowhere in the statute or case law.  Without question, a plaintiff is entitled to re-file its claims following a dismissal without prejudice.

---

[1] *See, e.g., Gart*, 254 F.3d at 1346 (holding: (1) in determining whether actual notice has been provided the Court "cannot take into consideration the knowledge or understanding of the alleged infringer" and (2) whether or not an alleged infringer subjectively believes a patentee has

4

E-Loan's second contention is that the November 24, 2003, complaint itself failed to provide actual notice. This argument is flawed for three reasons. First, E-Loan's first argument that notice was "extinguished" upon dismissal is a tacit admission that actual notice had already occurred upon the filing of the Delaware complaint. Second, on February 14, 2004, E-Loan *answered* IMX's complaint in the Delaware Action and asserted an affirmative defense and counterclaim of non-infringement. Ex. B; IMX's SOMF ¶2. E-Loan could not have asserted this defense without investigating whether its own activities infringed the '947 patent. Moreover, E-Loan's Fifth Affirmative Defense in the Delaware Action relies on 35 U.S.C. § 287 concerning limiting damages for infringement occurring "prior to the filing of the Complaint," which is yet another admission that the filing of the Delaware complaint constituted actual notice. Ex. B. Third, E-Loan's argument is contrary to the plain language of the statute which only requires the filing of a complaint to provide notice. 35 U.S.C. §287(a).[2] Accordingly, E-Loan had actual notice of infringement on November 23, 2003. *Id.*; IMX's SOMF ¶2.

IMX's filing of an action for infringement of the '947 patent against E-Loan on November 24, 2003, provided notice of infringement to E-Loan as a matter of law, and IMX is permitted to seek damages for all infringing acts occurring thereafter.

**C.    IMX Owns The '947 Patent**

IMX, like many other companies, has registered to do business under various names since its inception. While IMX has used various names, IMX always has been, and remains, the

---

charged her with infringement "has no bearing on the adequacy of notice").

[2] When the terms of a statute are unambiguous, as here, judicial inquiry is complete, except in rare and exceptional circumstances – none of which is present here. *Rubin v. U.S.* 449 U.S. 424, 430 (1981); *see also Crooks v. Harrelson*, 282 U.S. 55, 59-60 (1932). Nothing in the statute's unambiguous language permits E-Loan to "inject" an "extinguishing" provision. *See, e.g., Astra v. Lehman*, 71 F.3d 1578, 1580 (Fed. Cir. 1995). The statute does not, as E-Loan contends, accept some "[f]iling[s] of action[s] for infringement" as notice and later reject others as "extinguished." Because there are no exceptional circumstances that warrant deviation from the plain language of Section 287(a), the plain language controls.

same legal entity.

In 1996, IMX incorporated in Delaware as IMX, Inc.  (Ex. E; IMX's SOMF, ¶4.)  Other than for a brief period from 1999 to 2001, the name appearing on IMX's Certificate of Incorporation has been IMX, Inc.[3]  From 1996 to the present, IMX registered to do business in California (its principal place of business) under three different fictitious business names.  Exs. F, H-J, L-P; IMX's SOMF ¶5.  Registering under these names gave IMX the right to transact business in California.  Exs. F, L, N.  The chart below sets forth each of IMX's legal names and registered fictitious business names in California from its inception in 1996 to the present:

| Legal Name of IMX (Certificate of Incorporation – Delaware) | Registered Fictitious Business Name (in California) |
| --- | --- |
| IMX, Inc. (1996 to 1999) | IMX Industrywide Mortgage Exchange, Inc. (1996 to 1998) |
| IMX Exchange, Inc. (1999 to 2001) | IMX Mortgage Exchange (1998 to 2000) |
| IMX, Inc. (2001 to present) | Delaware IMX, Inc. (2001 to present) |

Exs. E, F, G at IMX-E074084, -74099, -74116; H, K, L, N; IMX's SOMF ¶¶4-5.  As this chart shows, IMX always has been incorporated in Delaware and always has transacted business from a principal place of business in California under a registered fictitious business name.  Exs. E-P.

On May 21, 1998, the three inventors of the '947 patent – all of whom were employees of IMX – assigned "*the full and exclusive right, title and interest*" in the '947 patent to "IMX Mortgage Exchange" (the "1998 Assignment"), the fictitious business name that IMX was using at the time.  Ex. D at IMX-E003431 (emphasis added); Ex. T, Adiga Decl., ¶5; IMX's SOMF ¶¶6-10.  The 1998 Assignment was recorded with the USPTO.  Ex. D at IMX-E003425-003434.  It is well settled in California that doing business under the name of a fictitious entity does not create a legal entity separate from the corporation.  *See, e.g., Pinkerton's, Inc. v. Super. Ct.*, 49

---

[3] In 1999, IMX, Inc. amended its Certificate of Incorporation and changed its name to IMX Exchange, Inc.  (Ex. G at IMX-E073917.)  In 2001, IMX again amended its Certificate of Incorporation and changed its name back to IMX, Inc.  (Ex. K.)

Cal. App. 4th 1342, 1348-49 (1996) (collecting cases and holding that suit brought against a "DBA" is a suit the legal entity because a fictitious business name is merely descriptive of or an alias of legal entity); 46 Cal. Jur. 3d Names §20 (2009).  Thus, there is no reasonable dispute that the legal entity – IMX, Inc. – has been the assignee of the '947 patent since 1998.

Notwithstanding the inventors' clear relinquishment of any right in the '947 patent to their employer IMX, E-Loan contends that three words in the assignment render it ineffective. Specifically, it contends that because the assignment identifies IMX Mortgage Exchange as "a California corporation" in a recital, the assignment is invalid because IMX, regardless of what name it used at the time, never was incorporated in California.  (Ex. D.)  E-Loan's position is without merit.  While IMX has never been a California corporation *per se*, the assignment is nevertheless effective as the inventors clearly intended to, and did in fact, assign their interest in the '947 patent to their employer (IMX) whom they correctly identified by name and address in the assignment.  Exs. D, F; Ex. T, Adiga Decl., ¶¶4-7; IMX's SOMF ¶¶4-11.

It is well established that "the proper construction of [patent] assignment agreements . . .is a matter of state contract law." *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996); *Regents of Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1118 (Fed. Cir. 2003) ("[s]tate law governs contractual obligations and transfers of property rights, including those relating to patents").  California contract law applies to the 1998 Assignment because it was entered into in California.  Cal. Civ. Code §1646; *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1450 (2007).[4]

---

[4] Should E-Loan contend that Delaware law applies to the 1998 Assignment because IMX was (and is) a Delaware corporation, the outcome would be the same.  Indeed, Delaware law also provides that the intent of the parties controls the interpretation of a contract and that contracts must be interpreted, if possible, in a way that preserves their validity.  *See E.I du Pont de Nemours v. Shell Oil Co.*, 498 A.2d 1108, 1113-14 (*Del. Supr.* 1985).

Under California contract law, "[t]he interpretation of a contract is a judicial function." *Wolf v. Walt Disney Pictures & Tel.*, 162 Cal. App. 4th 1107, 1125-26 (2008).[5] "In engaging in this function, the trial court 'give[s] effect to the mutual intention of the parties as it existed' at the time the contract was executed." *Id.*; Cal. Civ. Code §1636. "Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms." *Id.*; Cal. Civ. Code §§1638, 1639. Moreover, "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." Cal. Civ. Code §1643; *Jacobs v. Freeman*, 104 Cal. App. 3d 177, 188-89 (1980).

Here, the objective intent of the inventors that signed the 1998 Assignment is clear based upon the contract's terms – *i.e.* the inventors intended to assign all right, title, and interest in the '947 patent to a company called "IMX Mortgage Exchange" (IMX's DBA in 1998) that was located at "111 Deerwood Road, Suite 220, San Ramon, CA 94583" (IMX's place of business at the time). Ex. D; IMX's SOMF ¶¶4-11. The relevant portions of the 1988 Assignment show:

> WHEREAS, IMX MORTGAGE EXCHANGE, a California corporation, having a place of business at 111 Deerwood Road, Suite 220, San Ramon, CA 94583, is desirous of acquiring the exclusive right, title and interest in and to said invention and in and to the Letters Patent to be granted and issued therefor in the United States of America and its territories and possessions, and in all countries foreign thereto;
>
> NOW, THEREFORE, for a valuable consideration, the receipt of which is hereby acknowledged, we, STEPHEN K. FRASER, SADASHIV ADIGA, AND SURESH PAYANKANNUR, do sell, assign, transfer and set over unto the said IMX MORTGAGE EXCHANGE, its successors and assigns, the full and exclusive right, title and interest in and to said invention, and in and to any and all Letters patent to be granted and issued therefor, not only for, to and in the United States of America, its territories and possessions, but also for, to and in all other countries including all priority rights under the International Convention; and we hereby authorize and request the Commissioner of Patents and Trademarks to issue said Letters Patent to said IMX MORTGAGE EXCHANGE, its successors and assigns, in accordance with this Assignment.

Ex. D. Because IMX, Inc. is the legal entity that corresponded to the fictitious business name IMX Mortgage Exchange at the above address in 1998, IMX, Inc. is, by operation of law, the assignee of all right, title and interest in the '947 patent. Exs. D, F, H-J; Ex. T, Adiga Decl.,

---

[5] Under California law, the interpretation of an assignment is subject to the same rules of interpretation of contract terms generally. *See, e.g., Orion Tire Corp. v. Goodyear Tire & Rubber Co., Inc.*, 268 F.3d 1133, 1138-39 (9th Cir. 2001).

¶¶5,7.; *Pinkerton's*, 49 Cal. App. 4th at 1348-49.  There is no ambiguity in the contract on this point.

To the extent the language "a California corporation" creates a latent ambiguity as to the entity the inventors intended to assign the '947 patent, extrinsic evidence clearly demonstrates that the inventors intended to assign the '947 patent to IMX.  *Wolf*, 162 Cal. App. 4th at 1126 ("if extrinsic evidence reveals that apparently clear language in the contract is, in fact, 'susceptible to more than one reasonable interpretation,' then extrinsic evidence may be used to determine the contracting parties' objective intent") (citation omitted); *Los Angeles City Employees Union v. City of El Monte*, 177 Cal. App. 3d 615, 622-23 (1985) ("In ascertaining the intent of the parties, the court may resort to extrinsic evidence not only to resolve a facial ambiguity but to determine the existence of and resolve a latent ambiguity . . . An ambiguity is latent if the resort to extrinsic evidence reveals that what appears to be perfectly clear language is in fact susceptible of more than one reasonable interpretation"); Cal. Civ. Proc. §1856(g). "When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law" and "[t]his is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence." *Wolf*, 162 Cal. App. 4th at 1126-27.  The following extrinsic evidence is undisputed:

- IMX, Inc. was registered to transact business in California as IMX Mortgage Exchange on May 21, 1998.  Exs. F & H; IMX's SOMF ¶5.;

- IMX Mortgage Exchange's offices were located at 111 Deerwood Road, Suite 220, San Ramon, California 94583 on May 21, 1998.  Ex. G at IMX-E074084, -74099, -74116; Exs. H-J; Ex. T, Adiga Decl., ¶7; IMX's SOMF ¶11.;

- Each of the inventors worked for IMX, Inc. on May 21, 1998.  Ex. T, Adiga Decl., ¶¶3-4, 6; IMX's SOMF ¶10.;

- One of the inventors, Stephen Fraser, was a founder of IMX, Inc.  Ex. T, Adiga Decl., ¶3.;

9

- IMX Mortgage Exchange was never incorporated in California as a separate entity from IMX, Inc. Exs. F & H (IMX Mortgage Exchange was a d/b/a of IMX, Inc.; Ex. T, Adiga Decl., ¶5.

Based on the extrinsic evidence, the only reasonable interpretation of the assignment is that the inventors intended to assign the '947 patent to IMX when the 1998 Assignment was executed because IMX is *the only legal entity* that the inventors could have been referring to as IMX. To find otherwise would violate the rule that the contract "***must*** receive an interpretation as will make it lawful, operative, and capable of being carried into effect" because the Court would have to find that the inventors intended to assign the '947 patent to a legal entity that did not exist. *See* Cal. Civ. Code §1643 (emphasis added). Such a result would be nonsensical, particularly when the inventors properly identified IMX (their employer) by name and address. Exs. D & F; Ex. T, Adiga Decl., ¶¶4-7; IMX's SOMF ¶¶4-11.

Notably, the Federal Circuit recently decided essentially the exact same issue. *See Tri-Star Elect. Int'l, Inc., v. Preci-Dip Dutral SA*, 619 F.3d 1364 (Fed. Cir. 2010). In *Tri-Star* the patent assignment-at-issue misidentified the transferee company as an Ohio corporation rather than properly as a California corporation. *Id.* at 1366-67. The district court held that the assignment transferred the patentee's interest to the California corporation (even though it was identified as being incorporated in Ohio) because such an interpretation "maintains the validity of every contract provision . . . and gives effect to the contract's purpose of assigning the invention to [the patentee's] employer." *Id.* at 1367. The Federal Circuit upheld the district court's ruling on the same grounds. *Id.* The present case is no different – the 1998 Assignment merely misidentifies the inventors' employer (IMX) as a California corporation instead of properly referring to it as a Delaware corporation. Such a scrivener's error is not fatal to an otherwise valid transfer of patent ownership. *Tri-Star* is dispositive of this issue.

10

Finally, any argument by E-Loan that the rights assigned to IMX Mortgage Exchange (the fictitious business) under the 1998 Assignment did not automatically inure to IMX (the legal entity), fails for two separate reasons.  First, and as noted above, because doing business under the name of a fictitious entity does not create a legal entity separate from the corporation, an assignment to the fictitious entity has the same effect as an assignment to the actual legal entity. *Pinkerton's*, 49 Cal. App. 4th at 1348-49.  Second, to make it clear that all rights passed from the fictitious entity to the legal entity, IMX Mortgage Exchange executed a *nunc pro tunc* assignment in favor of IMX with an effective date of May 21, 1998 – the date of the 1998 Assignment.  Exs. Q, R at 8:8-18, 21:2-18, 28:1-29:6, 55:6-13, 67:25-68:23, 80:22-81:12, 83:16-84:4, 90:23-91:5, & S at 9:2-11, 57:14-58:14; IMX's SOMF ¶¶12-14.; *Southwest eFuel Network, L.L.C. v. Transaction Tracking Tech., Inc.*, 2009 WL 4730464, *2-4 (E.D. Tex. Dec. 7, 2009) (pre-suit *nunc pro tunc* assignment corrected clerical error and standing).  While not necessary because all rights in the '947 patent did, in fact, inure to IMX under the 1998 Assignment, the *nunc pro tunc* assignment eliminates any lingering doubt.

IMX has owned the '947 patent outright since the inventors executed the 1998 Assignment.  The words "a California corporation" appearing in a recital in the 1998 Assignment do not in any way undermine IMX's ownership rights.

**D.      Undisputed Documentary Evidence Corroborates That The Inventors Conceived Of The Inventions In The '947 Patent No Later Than August 1995**

In patent law, conception occurs when "the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention." *Univ. of Pittsburg of Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1297-98 (Fed. Cir. 2009).  The bar for proving conception is low:  the inventor "need only show that he had the complete

mental picture and could describe it with particularity."[6] *Id.* at 1298. Where a party seeks to show conception through oral testimony of an inventor, corroboration of that testimony is required. *Mahurkar*, 79 F.3d at 1577. No corroboration is required where conception is proven through the use of physical exhibits as "[t]he trier of fact can conclude for itself what documents show, aided by testimony as to what the exhibit would mean to one skilled in the art." *Id.* at 1577-78; *see also Hitzeman v. Rutter*, 243 F.3d 1345, 1354-55 (Fed. Cir. 2001)(holding that disclosure of the claim elements may be express or inherent in the supporting documentation).

Conception is a question of law based upon subsidiary findings of fact. *See Purdue Pharma L.P. v. Boehringer Ingelhein GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). However, where, as here, there is undisputed and corroborated evidence of conception, a finding of a date of conception as a matter of law is appropriate. *See Mahurkar*, 79 F.3d at 1578-79 (finding conception prior to an alleged prior art reference as a matter of law where the patentee offered testimonial evidence that was corroborated by documents).

### 1.      Documentary Evidence Of The Inventors' Conception

As noted in the introduction, by August 1995, the inventors had reduced to writing the ideas that would become the subject matter of the '947 patent. Exs. V-X; Ex. T, Adiga Decl., ¶¶9-34; IMX's SOMF ¶¶15-20. Specifically, at least three documents from July-August 1995 provide a particularized description of the inventions of the '947 patent: (1) a Software Architecture Document drafted by Dr. Adiga; (2) a Requirements Specification drafted by Mr. Payankannur; and, (3) a Project Log (collectively, the "Conception Documents"). Exs. V-X; Ex. T, Adiga Decl., ¶¶9-34; IMX's SOMF, ¶¶15, 17, 19. As discussed in detail below, the

---

[6] Put another way "[t]he determinative inquiry is not whether the inventor's disclosure was phrased certainly or tentatively, but whether the idea expressed therein was sufficiently developed to support conception of the subject matter." *Univ. of Pittsburg of Commonwealth*

Conception Documents demonstrate that the inventors had a complete mental picture of the inventions of the asserted claims of the '947 patent no later than August 1995.

a.       **Conception of Claims 1 and 19**

Claims 1 and 19 provide a method and a system, respectively, for processing loan applications using a transaction server connected to a database of pending loan applications and their statuses that can be searched and modified by the relevant parties – the borrower (or his representative) and the lender.  Ex. U, '947 patent, 14:66-15:5 & 15:59-16:2.  The Conception Documents set forth each element of these claims.

(1)      **The Conception Documents Disclose A Method and System<br>For Processing Loan Applications**

The goal of the inventors was to take the cumbersome procedure for processing paper loan applications and automate the system so that borrowers and lenders could lock loans in an efficient and inexpensive way.  Ex. W at IMX-E026326 (Overview of Requirements section); Ex. T, Adiga Decl., ¶¶14-15.  To carry out the automated processing of loan applications the inventors identified certain hardware components that correlate to the hardware elements in the claims of the '947 patent – namely, a "Client-Server (C-S) model" where the "IMEX Server consists of a collection of three separate servers – a HTTPD server, Application Server and Database Server."  Ex. V at IMX-E026323 (System Architecture section); Ex. T, Adiga Decl., ¶16. The inventors further described in detail how the integration of these hardware devices with software would permit an "Application Transaction Flow" process whereby the user could log on, fill out forms related to a prospective mortgage and connect to (and interact with) the servers based upon requests input by the user.  Ex. V at IMX-E026323-24 (Application Transaction

---

*Sys. of Higher Educ.*, 573 F.3d at 1297-98 (citing *In re Jolley*, 308 F.3d 1317, 1324 (Fed. Cir. 2002)).

Flow section); Ex. T, Adiga Decl., ¶17.  This integrated system could then be used to search for and lock mortgages as well as generally process loan application information.  Ex. W at IMX-E026327; Ex. T, Adiga Decl., ¶18.  As such, the Conception Documents disclose a fully integrated system for processing loan applications.

         **(2)**      **The Conception Documents Disclose Storing Pending Loan Applications And Their Statuses In A Database Connected To A Transaction Server**

Claims 1 and 19 require, in part, a database of pending loan applications and status information regarding the pending loan applications.  The Conception Documents disclose these claim elements.  Ex. V at IMX-E026323 (System Architecture and Application Transaction Flow sections), IMX-E026325 (Section E.3), Ex. W at IMX-E026327 (Section 3.2.4); Ex. T, Adiga Decl., ¶¶19-22; IMX's SOMF ¶21.

Two of the key components of the loan processing system that are set forth in the Conception Documents are the database server and the transaction server that automate the application process.[7]  Ex. V at IMX-E026323 (System Architecture section); Ex. T, Adiga Decl., ¶20.  In the system the inventors conceived, the database and transaction servers were functionally connected to each other and the other servers that constituted the system.  *Id.*

The Conception Documents also contain ample discussion of storing pending loan applications and their statuses.  Ex. V at IMX-E026323 (Application Transaction Flow section & Section E.3), Ex. W at IMX-E026327 (Section 3.2.4); Ex. T, Adiga Decl., ¶¶21-22; IMX's SOMF ¶21.  For example, the Software Architecture Document notes under the "System Architecture" heading that the "IMEX Server consists of a collection of three separate servers – A HTTPD server, Application Server, and Database Server."  Ex. V at IMX-E026323 (System

---

[7] The "transaction server" is the descriptive name chosen for the IMEX Server in the '947 patent. Ex. T, Adiga Decl., ¶16.

Architecture section); Ex. T, Adiga Decl., ¶20.  This section also confirms that the "Database server will be Illustra."  *Id.*  In the "Application Architecture" section, the inventors explain that the "database interface is expected to be in two parts:  a stub that resides in the Application Server and the corresponding item in Illustra (i.e., database server)."  *Id.*

The document further explains, in the "Application Transaction Flow" section, that data entered by the user (*i.e.*, loan applications from the borrower/broker or loan offers from the lender) is received and stored in the database, noting "[d]ata [is] transmitted to the IMEX Server" and that "[d]ata received by HTTPD Server, call CGI scripts, invokes Application Server (C++ program), processing and retrieval/storage of data from Data Server."  Ex. V at IMX-E026323-24 (Application Transaction Flow section); Ex. T, Adiga Decl., ¶21.  As the inventors noted, they were already implementing "an application framework for HTTPD server side applications that supports: … database storage."  Ex. V at IMX-E026325; Ex. T, Adiga Decl., ¶21.

The Requirements Specification also confirms that loan application and status information pertaining to a loan application was maintained by the system.  Ex. W at IMX-E026327 (Section 3.2.4); Ex. T, Adiga Decl., ¶22; IMX's SOMF ¶21.  As noted in the "Mortgage Management" section, one of the stated functions is that "[t]he broker should be able to inquire [about] the status of the mortgage(s)."  *Id.*  This section also notes that "[t]he broker should be able to enter the mortgage details and request for a loan" and describes the mortgage being "registered with IMEX."  *Id.*  "Registering" the mortgage with IMEX is a reference to storing the loan application in the database.  Ex. T, Adiga Decl., ¶22.

Based on the foregoing, there is no dispute of material fact that the Conception Documents describe storing pending loan applications and status information in a database as required by claims 1 and 19.  IMX's SOMF, ¶21.

     **(3)**     **The     Conception     Documents     Disclose     Real-Time Responsiveness Of The Transaction Server To Requests From The Lender Or The Borrower[8]**

The Conception Documents disclose real-time responsiveness of the transaction server to requests (*e.g.,* requests for searching and requests for modifying the database) from parties to the pending loan applications. Ex. V at IMX-E026323 (Application Transaction Flow section); Ex. T, Adiga Decl. ¶27; IMX's SOMF ¶23. Specifically, items 5, 6 and 7 in the Application Transaction Flow section of the Software Architecture Document describe the communication-response exchange in a typical user session. *Id.* The IMEX Server supported real-time responsiveness because borrowers and lenders could access the server from client devices over the Internet. Ex. T, Adiga Decl., ¶27. As such, the Conception Documents disclose real-time responsiveness of the transaction server to borrower and lender requests.[9] IMX's SOMF ¶23.

     **(4)**     **The Conception Documents Disclose A Database That Can Be Searched And Modified By The Lender Or The Borrower Consistent With Their Roles In The Transaction**

The Conception Documents are quite clear that borrowers (or their representatives) and lenders would be able to search and modify the system's database consistent with their roles in the mortgage transaction. Ex. V at IMX-E026323-24 (System Architecture and Application Transaction Flow sections & Handling Notifications section), Ex. W at IMX-E026326-27 (Sections 3.2.2, 3.2.4 & 3.2.5); Ex. T, Adiga Decl., ¶¶23-26; IMX's SOMF ¶22. This is a requirement of both claims 1 and 19. For example, the Software Architecture Document notes under the "System Architecture" heading that "[l]oan brokers and lender will interact with a

---

[8] This is not a requirement of independent claim 1 or asserted dependent claims 2, 7, 8, 9, 10, 11 and 12.

[9] Even if the Court were to conclude that real-time responsiveness was not conceived of by this date, claim 1 is not limited to real-time, and therefore an adverse finding would have no effect on the conception date of claim 1. *Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir. 1985).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Client that will reside in their respective local machines.  The Client (on WindowsNT or Sun) will run a WWW browser (Netscape/Hot Java/lynx).  This client will send request for processing to a server, named as IMEX Server (Sun)."  Ex. V at IMX-E026323 (System Architecture section); Ex. T, Adiga Decl., ¶24.  These client devices (or stations) permitted users to interact with the IMEX Server.  Ex. T, Adiga Decl., ¶24.

The requests sent to the IMEX server by the borrower (or broker) and lender consistent with their role in the transaction are requests to search and modify the database of loan applications.  Ex. T, Adiga Decl., ¶25.  The Requirements Specification identifies the roles and activities of the borrower and the lender with the system.  *Id.*  For example, Section 3.2.2 of the Requirements Specification notes that "the brokers can place their mortgages and the lending institutions can bid on them...."  Ex. W at IMX-E026326 (Section 3.2.2); Ex. T, Adiga Decl., ¶25.  This section also notes that "[t]he main activity at the broker site is submitting a loan request for a mortgage.  On the other hand, the lender should be able to review and make a bid on these mortgages."  *Id.*  In Section 3.2.4, the Requirements Specification notes with regard to the borrower roles that "[t]he broker should be able to enter the mortgage details and request for a loan[,]" "[t]he broker should be able to inquire [about] the status of the mortgage(s)[,]" "[a] broker can modify the mortgage after it is registered with IMEX[,]" and "[a] broker should be able to accept a bid."  Ex. W at IMX-E026327 (Section 3.2.4); Ex. T, Adiga Decl., ¶25.  With regard to lender roles, Section 3.2.5 of the Requirements Specification notes that "[t]he lender could request [a] certain view of the mortgage pool depending on his/her interest[,]" "lender should be able to place a bid[,]" and "[a] lender can modify a bid."  Ex. W at IMX-E026327 (Section 3.2.5); Ex. T, Adiga Decl., ¶25.

Further, under the "Application Transaction Flow" heading, the Software Architecture

17

Document describes the typical message exchange using the system in which these search and modification requests were handled. Ex. V at IMX-E026323 (Application Transaction Flow section); Ex. T, Adiga Decl., ¶26. As a result of these search and modification requests, as noted further in the Software Architecture Document, there was a "need [for] lots of database query and update forms." Ex. V at IMX-E026324 (Handling Notifications section); Ex. T, Adiga Decl., ¶26. Thus, the Conception Documents demonstrate the conception of a database that can be searched and modified by borrowers or lenders consistent with their respective roles in the loan transaction. Ex. V at IMX-E026323-24 (System Architecture and Application Transaction Flow sections & Handling Notifications section), Ex. W at IMX-E026326-27 (Sections 3.2.2, 3.2.4 & 3.2.5); Ex. T, Adiga Decl., ¶¶23-26; IMX's SOMF ¶22.

Based on the foregoing, the Conception Documents demonstrate that complete conception of claims 1 and 19 of the '947 patent occurred no later than August 1995.

### b.    Conception of Claim 20

Claim 20 depends on Claim 1 and requires that there be a "client associated with each [] party" that uses the loan processing system. Ex. U, '947 patent, 16:3-4. The inventors of the '947 patent specifically envisioned the use of client devices (personal computers with an Internet browser) by the various parties using the system (e.g., broker and lenders) in the Conception Documents. Ex. V at IMX-E026323 (System Architecture section); Ex. T, Adiga Decl., ¶¶23-24; IMX's SOMF ¶22. Accordingly, the inventors conceived of the subject matter of claim 20 in July/August 1995.

### c.    Conception of Claims 2 and 21

Claims 2 and 21 require that the loan applications that are processed be "mortgage loan application[s]." Ex. U, '947 patent, 15:6-7 & 16:5-6. As the inventors envisioned that the initial

embodiment of their invention would be used to process mortgages, this aspect of the invention was conceived of no later than August 1995.  Ex. W at IMX-E026326-27 (Sections 3.2.2 & 3.2.4); Ex. T, Adiga Decl., ¶¶19, 22; IMX's SOMF ¶21.

### d.      Conception of Claims 7 and 26

Claims 7 and 26 require that the lender using the system have a lender station that can be used to search the system's database for desired types of loans and bid on those loan applications.  Ex. U, '947 patent, 15:22-27 & 16:24-29.  Claim 26 further provides that the search and bid requests be routed through the transaction server.  *Id.* at 16:24-29.

The inventors envisioned that the lender(s) would use a personal computer (a client device) to gain access to the transaction server and database over the Internet.  Ex. V at IMX-E026323 (System Architecture section); Ex. T, Adiga Decl., ¶¶23-24; IMX's SOMF ¶22.  The Conception Documents further provide that lenders would be able to query the system's database for certain types of loans and then bid on those loans.  Ex. W at IMX-E026327 (Section 3.2.5); Ex. T, Adiga Decl., ¶¶23, 25; IMX's SOMF ¶22.  These documents also demonstrate that such queries and bids would be routed through the transaction server.  Ex. V at IMX-E026323 (Application Transaction Flow section); Ex. T, Adiga Decl., ¶¶23, 26.  Accordingly, the inventors had fully conceived of the subject matter of these claims no later than August 1995.

### e.      Conception of Claims 8 and 27

Claims 8 and 27 add a limitation that requires that the lender be notified when its bid on a loan application is accepted.  Ex. U, '947 patent, 15:29-30 & 16:30-31.  This functionality was also specifically contemplated as part of the initial embodiment of the invention no later than August 1995.  Ex. W at IMX-E026327 (Section 3.2.5); Ex. T, Adiga Decl., ¶¶28-29; IMX's SOMF ¶24.

### f.      Conception of Claims 9-12 and 28-31

Claims 9, 11, 28 and 30 provide that the system's database include identifiers or computed values "which might of interest to lenders." Ex. U, '947 patent, 15:37-38 & 16:38-40. Claims 10 and 29 provide that the identifiers stored in the database include "a property location, borrower credit information or CRA qualification for the property." *Id.* at 15:34-36 & 16:35-37. Claims 12 and 31 require that the computed values that are included in the system's database include a credit score. *Id.* at 15:39-40 & 16:41-42. The database envisioned by the inventors included identifiers and computed values from the information entered by a potential borrower or borrower's agent on the loan application that included this information. Ex. W at IMX-E026327-28 (Sections 3.2.5, 3.2.7 & 3.5), Ex. X at IMX-E026384; Ex. T, Adiga Decl., ¶¶30-33; IMX's SOMF ¶25. Any of this computed information might be of interest to a lender. Ex. T, Adiga Decl., ¶¶30-32. Accordingly, the inventors had fully conceived of the subject matter of these claims no later than August 1995.

## V.      CONCLUSION

For these reasons, IMX is entitled to summary judgment on notice of infringement, patent ownership and an August 1995 conception of the asserted claims.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2010, I filed the foregoing document with the Clerk of the Court who will generate Notices of Electronic Filing to all counsel of record or other persons authorized to receive Notice of Electronic Filing generated by CM/ECF, including counsel for Defendants, Samuel A. Lewis, Feldman Gale, 2 South Biscayne Boulevard, 30th Floor, Miami, Florida 33131.

ASTIGARRAGA DAVIS MULLINS
& GROSSMAN, P.A.

701 Brickell Avenue
16th Floor
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile (305) 372-8202

By: _____/s Edward M. Mullins_____
    Edward M. Mullins
    Annette C. Escobar
    Fla. Bar Nos. 863920 & 369380
    emullins@astidavis.com

Local Counsel for Plaintiff IMX, Inc.

-AND-

M. Elizabeth Day (Bar No. 177125)*
Marc Belloli (Bar No. 244290)*
Erik R. Fuehrer (Bar No. 252578)*
DLA PIPER LLP (US)
2000 University Ave.
East Palo Alto, CA 94303
Telephone: 650.833.2000
Fascimile: 650.833.2001

Lead Counsel for Plaintiff IMX, Inc.